## O'Hara v. Commonwealth.

(Decided April 29, 1915.)

### Appeal from Fayette Circuit Court.

1. Homicide—Instructions—Self Defense—Concert of Action on Part of Deceased and Another.—Evidence examined, and held: That there was no evidence sufficient to require a self defense instruction to include the danger to defendant from a companion of the deceased, where there was no act or demonstration upon the part of such companion such as reasonably indicated an impending purpose to harm defendant.

2. Criminal Law—Motion for New Trial—Newspaper Accounts of Trial Read by Jury.—Where upon a trial for homicide, the jury obtained and read newspapers containing accounts of the trial including the report of a motion made by defendant to set aside the swearing of the jury because in viewing the scene of the crime a witness had explained a detail of the killing concerning a gate, appellant's substantial rights were not prejudiced under the circumstances shown.

JESSE I. MILLER, J. A. WILMORE and WM. H. TOWNSEND for appellant.

JAMES GARNETT, Attorney General, and R. T. CALDWELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

Steve Antonio, a Greek, was shot and killed by the appellant, Patrick O'Hara, in front of a house on Megowan street, in Lexington, on the afternoon of August 31, 1914.

Antonio and John Thomas, another Greek, who were engaged in the restaurant business next door, were conversing with Sallie Holland and Lizzie Fraley, two of the inmates of the house. Antonio was seated on a railing which extended from the gate to the porch, with his back to the street, when O'Hara came out of a house almost directly opposite, advanced to the middle of the street, looked into the restaurant conducted by the Greeks, and then proceeded to the sidewalk in front of the house where he shot Antonio. The bullet entered his back about an inch and a half from the left armpit, passing out two inches to the right of the left nipple. Antonio ran into the house and there fell dead. O'Hara fired two additional shots, but neither of them took effect. Thomas fled when the firing began. Officers who arrived

in a few minutes found no weapons on or about the body of the deceased.

O'Hara was indicted and upon trial convicted of manslaughter. He appeals.

He testified that on the day before the killing he and others were engaged in a crap game on the L. & N. bridge on Megowan street, when Steve Antonio, John Thomas, and a third Greek known as "Long Tom" joined the game, in the course of which an altercation arose, and the Greeks thereupon beat him almost into insensibility; that during the day and on the day following, before the killing, he received from various persons information that the Greeks had made threats to kill him if he ever came back on Megowan street; that on Monday, the day after the trouble over the crap game, he went with his brother to a restaurant on Wilson street to get dinner, but finding it closed, they decided to go to a restaurant on Megowan street conducted by one Polis; that they proceeded down the west side of Megowan street, and crossed the street diagonally to the Polis restaurant, where they obtained dinner; that they then retraced their steps, but on arriving at the house of one Mabel Hughes, which was almost directly opposite the restaurant conducted by Thomas and Antonio, and the house in front of which Antonio was afterward killed, they went into Mabel Hughes' to use the toilet; that when they came out, defendant borrowed a dime from his brother for the purpose of returning to the Polis restaurant to obtain cigarettes; that while proceeding in the direction of that restaurant he crossed the street and came upon the sidewalk about half way between the door of the restaurant conducted by Thomas and Antonio and the gate where Antonio was seated; that he continued down the sidewalk past where Antonio was seated; that about this time the Greeks began conversing in an animated manner in their native tongue and seemed greatly excited; that just as he passed Antonio, Thomas, who was on the porch, got up and started down off the porch, and that when he (defendant) had got past Antonio about twenty feet, looking back over his shoulder he saw Antonio throw his hand to his hip and jump up from his seat, whereupon defendant shot him, and then fired two more shots at Thomas, who was coming toward the gate. Defendant testified that he shot because he "believed Steve Antonio was preparing to shoot him."

1.   In instructing the jury as to appellant's right to defend himself, the court restricted his right to do so, to and against such injury only as he believed and had reasonable grounds to believe that Antonio was then about to inflict upon him.

Appellant complains of this, contending that the instruction should have included his right to defend against injury from either or both of the Greeks.   The evidence, however, fails to exhibit any grounds for the apprehension of immediate injury at the hands of Thomas.   Defendant testified that Thomas started down off the porch, but there is no proof of any such hostile demonstration on his part as might reasonably be regarded as placing defendant in imminent danger of losing his life or the infliction of great bodily harm at the hands of Thomas, justifying a self-defense instruction as to him.   We, therefore, conclude that the facts shown were such that failure of the trial court to instruct on concert of action on the part of the two Greeks was not error.

We are not unmindful of the rule that where there is any evidence showing concert of action between the deceased and another or others sufficient to authorize a self-defense instruction as to one of them, or where there is any fact or circumstance from which such concert of action may be inferred, the court must in the self-defense instruction include the danger from any or all of those so acting.   Helton v. Commonwealth, 87 S. W., 1073, 27 R., 1163; Magann v. Commonwealth, 119 S. W., 734; Slone v. Commonwealth, 110 S. W., 235, 33 R., 266; Watkins v. Commonwealth, 123 Ky., 817, 97 S. W., 740, 29 R., 1273; Bowling v. Commonwealth, 126 S. W., 360; Lucas v. Commonwealth, 141 Ky., 281, 132 S. W., 416; Hall v. Commonwealth, 162 Ky., 439.

It is true that there was proof showing that there had been communicated to appellant information of threats made by both of the Greeks; but threats alone, unless followed by some overt act or demonstration of such character that, taken in connection with the threats, it reasonably indicates an impending purpose, real or apparent, to put such threats into execution, will not justify or excuse the killing of the person who uttered such threats.   Fitzpatrick v. Commonwealth, 81 Ky., 357, 5 R., 363.   So, had Thomas alone been in front of

the house when appellant passed, the mere fact of his stepping down off of the porch when appellant passed would not constitute such a demonstration of hostility as would have excused appellant's killing him, even if he had previously threatened to kill appellant, and such threats had come to appellant's knowledge. Appellant was twenty feet from the gate when he fired at Antonio, and Thomas never got outside the gate. There is absolutely no proof that he had or attempted to use any weapon, or that he said anything to him or did anything except to step off of the porch and proceed toward the gate; and he never was within twenty feet of appellant at any time. Under these circumstances we will not say the court erred to the prejudice of appellant in failing to instruct on concert of action between Antonio and Thomas.

Appellant testified that he believed he was in danger from the two Greeks; but to entitle one to a self-defense instruction there must be more than mere belief; there must be reasonable grounds for such belief.

2. Appellant's second complaint is that the jury which tried him procured and read during the trial copies of newspapers published in Lexington containing accounts of the trial, including a motion made by defendant to set aside the swearing of the jury. The newspaper account, so far as necessary to be here considered, was as follows:

"A surprise was sprung in the case this afternoon when Attorney Miller, for the defense, moved the court to set aside the jury, alleging for grounds that when the panel was taken to Megowan street for an examination of the scene of the killing, certain members of the jury got out of sight of the deputy sheriff, also that the jurors discussed the case; and, finally, that they overheard one of the witnesses in the case, Lizzie Fraley by name, explain a detail of the killing concerning a gate. Judge Kerr overruled this motion and said evidence in rebuttal would be heard later. * * * As soon as court convened Attorney Miller moved the court to set aside the jury on the grounds that some of the members had gotten out of sight of Deputy Freckman while on Megowan street examining the environment of the murder; and that the jurors discussed the case among themselves. Judge Kerr overruled the motion, but said he would consider evidence in rebuttal later."

It is contended by appellant that knowledge of his motion to set aside the swearing of the jury was calculated to prejudice the minds of the jurors against him and his attorneys, and that his substantial rights were thereby prejudiced.

To so hold would, however, give undue weight to the publications mentioned. Juries are composed of men of average intelligence; and such men know and understand that the accused and his counsel will avail themselves of every objection possible in order to prevent conviction or procure a reversal of the judgment of conviction; they know and understand that such action is a part of the trial of every prosecution of a serious nature; and no thought of reproach attends upon an accused by reason of such action upon his part. It may be conceded that now and then a juror would be found of such unusually sensitive temperament that he would resent such action upon the part of the defendant as came to the knowledge of the jurors in this case. But the overwhelming weight of the evidence produced in this case shows a deliberate assassination. Out of ten witnesses who testified that they saw the killing, eight said that at the time deceased was shot he was sitting on the railing leading to the porch of the house, with one hand on the gatepost and the other holding a cigarette, and with his back to the defendant; that the defendant deliberately walked up behind Antonio and shot him in the back, and then turned his revolver and fired twice in the direction of the other Greek and the women on the porch; that Thomas made no attempt to leave the porch; that he did not do or attempt to do anything to the defendant, and made no demonstration of any kind toward him; that Antonio seemingly did not see defendant or know he was near until the shot was fired.

Defendant is corroborated only by his brother and by the woman, Mabel Hughes; and the latter, both at the coroner's inquest and on the examining trial, testified as did the eight witnesses above mentioned, and then changed her testimony upon the last trial.

Under this state of the proof, the jury having fixed defendant's punishment at not less than seventeen nor more than eighteen years in the penitentiary, we are not disposed to concede that the jury was prejudiced against him from any cause.

Judgment affirmed.