## Winchester v. Commonwealth.

(Decided October 20, 1925.)

### Appeal from McCreary Circuit Court.

1. Homicide—Evidence Held Not to Entitle Accused to Instruction on Defense of Home.—In prosecution for murder, where evidence was in conflict as to place of shooting and showed no hostility to any one in accused's home, but that attack was on accused only, accused was not entitled to an instruction on defense of his home.

2. Criminal Law—Credibility of Witnesses for Jury, and Verdict will Not be Reversed, Unless Flagrantly Against Evidence.—Credibility of witnesses is for jury, and their verdict will not be reversed, unless flagrantly against the evidence.

3.  Criminal Law—That One of Jurors was Not Housekeeper, which
Fact was Not Discovered Until After Verdict, Held Not Grounds
for Setting Verdict Aside.—That one of jurors was not a house-
keeper, which fact was not learned until after verdict, is not
grounds for setting it aside, in view of Ky. Stats., section 2253,
providing that verdict shall not be set aside by reason of incom-
petent person having served on jury.

R. L. POPE, W. H. CAYLOR and J. E. STEPHENS for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K.
BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Tusco Winchester was indicted in the McCreary cir-
cuit court for the murder of James Cogar. On the trial
of the case he was found guilty of manslaughter and his
punishment fixed at confinement in the penitentiary for
twenty years. He appeals.

The parties were miners at the Paint Cliff mine in
McCreary county. About 1:30 p. m. one day last July,
Cogar, Winchester and Cleve Gregory, who was a
brother-in-law of Winchester, were at the commissary to-
gether. Coger suggested that they go up to the junction
and get some whiskey. They all went up to the junction;
Cogar got a quart of whiskey; they returned to the com-
missary and all drank of it. Winchester had made sev-
eral gallons of beer that day and told them about the beer
he had at home. About four o'clock Winchester went
home; Cogar and Gregory went with him. When they
got to Winchester's house they all drank of the beer.
When supper was ready Cogar stayed to supper but
Gregory went home. They all lived in miners' houses
built in a row about fifty feet apart. Gregory's house
was on one side of Winchester and Link Bybee's house
on the other side. After supper several of the neighbors
dropped in; among them were Link Bybee and Charlie
Mills. As to how the shooting occurred, the proof is
very conflicting.

The proof for the Commonwealth shows that both
Winchester and Cogar acted a little funny, like they had
been drinking whiskey. They were not down drunk, but
pretty full. Winchester began playing on the victrola
and Cogar said several times with vile epithets and an
oath that he wouldn't give two cents for the thing and

would shoot it up. About this time Mills and another man got Cogar out of the house and in the yard. Mrs. Winchester then asked Bybee to take him away. Bybee then went out and got hold of Cogar and took him over to the back of his house and told Winchester not to come over there. While Bybee and Cogar were sitting at the back of his house Winchester came out of his house into the yard, shot his pistol into the ground, asked where Cogar was and said, "I will put him out of the way." When this occurred Cogar jumped up; Bybee took him by the arm and tried to hold him. Cogar said with an oath, "You can do me that way tonight but you can't do me that way tomorrow," and started toward Winchester. About this time Winchester placed his pistol against the corner of Bybee's house and shot Cogar twice. Cogar had no knife and was not armed in any way. Cogar died a few hours later.

On the other hand, the proof for the defendant is to the effect that at the supper table Cogar said with an oath that he could get along with Gregory but that he had no use for Winchester. Winchester said, "Don't let's talk about that, don't let's have no trouble." Cogar then got to cursing and walked out on the porch. He walked back in the house and shut the door behind him. Winchester's wife went and opened it; it was a warm evening in July. He then shut the door again and stood against it. He then noticed Winchester's wife and her sister whispering to one another and he told them with an oath to stop whispering around there and that he would do as he pleased. He then got his knife out and said with an oath that he wouldn't go until he pleased. The wife and sister became alarmed at this and went out of the house through the back window, taking the little baby with them. They went to Cleve Gregory's house. He was in bed but got up and put his clothes on, and at Mrs. Winchester's request went over to Winchester's house. When he got there Pete Winchester, a neighbor and not related to appellant, had gotten Cogar out in the yard. But Cogar got loose from him and came back in, saying that he wouldn't leave until he got ready. He played the victrola and said with an oath that he would shoot the thing all to pieces and throw it out in the yard. Winchester told him that he had bought it and paid for it and didn't want it torn up. About this time Link Bybee, at the wife's request, took him over to his house. After this was done Winchester, thinking that he would be in less dan-

ger out doors than if sitting in the house, got his pistol and went out on the porch. When he got there he heard a racket at the corner of Bybee's house and saw Cogar in a tussle with Bybee. Winchester was standing with his hands against the corner of his house. Cogar got loose from Bybee and started towards Winchester. Winchester called out to him to stop and shot in the ground to let him know that he had a gun, thinking he would go on home and not come back. Winchester hollered to Bybee to hold on to him and he said, "I can't." He kept coming on; said he wasn't going to stop; drew a long knife, and when he got within about twenty feet, Winchester fired two shots at him and fired these in his necessary self-defense. The defendant proved by a number of witnesses that Cogar had during that afternoon the knife he described and also proved by several witnesses that he had the knife and opened it in Winchester's house before he left the house. On the other hand, the Commonwealth proved by a number of witnesses that there was no knife on Cogar's person after he was shot and none was found on the ground there. The defendant proved by a number of witnesses that Cogar had on four or five occasions made threats against his life and that he was a dangerous man when drinking.

On the other hand, the proof is clear that the parties had been friendly or apparently friendly all that evening together. They had been together from about 1:30 p. m. The shooting occurred about 7:30 p. m. The proof for the defendant also showed that he did not make any threat against Cogar when he came out with the pistol.

The court gave the usual instruction on self-defense. The defendant complains that no instruction was given on the defense of his home. The proof for the Commonwealth shows clearly that the shooting was done at Bybee's home and the Commonwealth insists that the instruction should not have been given for this reason. But the proof for defendant shows that the shooting was done at his own home when Cogar was only about twenty feet from him. And so the question is presented whether the defendant on his proof was entitled to an instruction on his right to defend his home.

There was no evidence that Cogar had any hostility to any one at Winchester's home except him, or intended any violence to any one else. While he had said that he would shoot the victrola and throw it out, this was while he was in the room and hearing the noise of the instru-

ment, and there is nothing in the evidence to indicate that he was returning to the house to hurt the victrola or the house in any way. If the defendant's evidence be true he had out his knife for the purpose of cutting defendant with it. The defendant himself testified that he shot the deceased because he was advancing on him with the knife and he believed himself in danger. He was then outside of the house. According to all the evidence for the defendant Cogar was attacking Winchester and not the house. The court, therefore, concludes that no substantial right of the defendant was affected by the failure of the court to give the defendant an instruction on the defense of his home. And if such instruction had been given it would not have affected the result of the case.

The verdict of the jury shows that they credited the witnesses for the Commonwealth and not the witnesses for the defendant as to how the difficulty occurred. The credibility of the witnesses is for the jury, and while the jury might well, under the evidence, have found for the defendant, their verdict is plainly not flagrantly against the evidence.

"The jury is the tribunal created by law to determine these matters, and this court will not on appeal disturb their findings unless palpably against the evidence." Harman v. Commonwealth, 140 Ky. 4.

There was no material error in the admission or rejection of evidence. It is complained that the new trial should have been granted because one of the jurors was not a housekeeper and this fact was not learned until after the verdict. Section 2253, Kentucky Statutes, after prescribing the qualifications of a juror, provides:

"But the fact that a person not competent served on a jury shall not be cause for setting the verdict aside, nor shall exceptions be taken to any juror for such cause after the jury has been sworn."

The fact that a juror is under twenty-one years of age or not a housekeeper is not, therefore, cause for setting a verdict aside. Combs v. Commonwealth, 97 Ky. 24; Netter v. Louisville Railway Co., 134 Ky. 678; L. & N. R. R. Co. v. King, 161 Ky. 324, City of Dayton v. Lory, 169 Ky. 94.

Judgment affirmed.